

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS**

**FILED**

JUL – 3 2007

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| STEVEN S. TUROFF,<br>as Litigation Trustee<br><br>Plaintiff,<br><br>vs.<br><br>ARTHUR ANDERSEN LLP<br>and RICHARD E. RAGSDALE<br><br>Defendants. | § § § § § § § § § § § § |

Case No. _____

# 3 0 7 – C V 1 1 9 8 – P

**JURY TRIAL REQUESTED**

## COMPLAINT

Steven S. Turoff, Litigation Trustee (the "Trustee") brings this suit against Arthur Andersen LLP and Richard E. Ragsdale, defendants, for a judgment declaring that the 413th Judicial District Court of Johnson County, Texas (the "state court") dismissed claims against defendants for lack of jurisdiction and that applicable law tolled limitations during the pendency of the state court case and for sixty (60) days after the dismissal order became final following affirmance by the Texas Court of Appeals for the Tenth Judicial District (the "court of appeals"). Subject to the Court's granting the declaratory relief, the Trustee also alleges the claims in Counts II through VI of this Complaint.

## SUMMARY OF ACTION

1.     The Trustee brings this case to recover damages for the benefit of creditors and persons who invested upwards of $200 million in ProMedCo Management Company ("PMC"), a Ponzi scheme that collapsed into bankruptcy in the fall of 2000. Directors and officers of PMC (particularly, its chairman, Ragsdale) and its outside auditor bear responsibility for the staggering losses to PMC, its investors, and its creditors. The Trustee seeks all appropriate relief, including actual and exemplary damages, pre-judgment and post-judgment interest, and costs of court.

2.     On June 12, 2002, the Trustee originally filed in the 18th District Court of Johnson County, Texas, a case involving claims substantially the same as claims alleged in this case.  The case was later transferred to the 413th District Court of Johnson County, Texas.  On June 4, 2004, the state court signed an Order Granting Director and Officer Defendants' and Arthur Andersen's Motion for Summary Judgment Against Plaintiff Due to Plaintiff Suing upon a Void Agreement and Therefore Lack of Standing.  Under Texas law, a summary judgment on the ground that the plaintiff lacks standing is a dismissal for lack of jurisdiction.  Section 16.064 of the Texas Civil Practices and Remedies Code tolls the applicable limitations periods for sixty (60) days so that the plaintiff may re-file his case in a court of proper jurisdiction.

3.     Consequently, the Trustee filed an adversary proceeding in bankruptcy court for the Northern District of Texas, Fort Worth Division, on June 10, 2004 where PMC's bankruptcy was pending.  On July 12, 2004, the Trustee also appealed the state court's ruling to the court of appeals.  While the Trustee's appeal of the state court's decision was pending, the defendants moved to dismiss the Trustee's adversary proceeding.  After the bankruptcy court expressed some reservation about proceeding concurrently with the state court appeal, the Trustee stipulated that he would dismiss the adversary proceeding to await the court of appeals' decision under the conditions that 1) the dismissal was without prejudice; 2) the dismissal should not count as or constitute a first or second dismissal under the provisions of Rule 41(a) of the Federal Rules of Civil Procedure; and 3) in the event the court of appeals held that the state court granted summary judgment against the Trustee on the ground that it lacked jurisdiction in the original state court action, the running of the applicable statute of limitations in relation to the claims asserted by the Trustee against the defendants in the state court action would be suspended between the date of the Trustee's original state court filing and sixty (60) days after the date on

which the state court judgment becomes final and non-appealable. The bankruptcy court entered an order reflecting the Trustee's stipulated dismissal on January 27, 2005.

4.      On March 21, 2007, without hearing oral argument, the court of appeals issued its 2-1 opinion, affirming the state court judgment solely on the ground that the Litigation Trust Agreement violated Texas public policy and that the Trustee therefore lacked standing to sue in Texas state courts. Because the court of appeals' affirmance of the state court's decision was dispositive of the appeal, the court of appeals declined to address any other issue.

5.      The state court's decision was jurisdictional and allowed the Trustee to re-file its complaint in the bankruptcy court under the provisions of the bankruptcy court's original dismissal. Due to an error by the bankruptcy court clerk, the underlying bankruptcy case upon which the Trustee based his adversary proceeding was closed. On May 2, 2007, the Trustee moved the bankruptcy court to reopen the case so he could re-institute his adversary proceeding, but the bankruptcy court refused to do so. The court also noted that its ruling did not preclude the Trustee from re-filling his case in another court of proper jurisdiction.

6.      Arthur Andersen admitted in its original docketing statement to the court of appeals that the state court's order was a "jurisdictional issue". It has now recanted and claims that the state court's decision instead addressed the merits of the Trustee's claims. Defendant Ragsdale also disputes the jurisdictional basis for the dismissal. The parties thus have a substantial and ongoing controversy regarding the effect of the state court's order.

## JURISDICTION

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds the value of $75,000.00, exclusive of interest and cost, and is between citizens of different states. Further, as a matter related to the PMC bankruptcy case as described herein, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).

## VENUE

8.     Venue properly lies within the Northern District of Texas pursuant to the provisions of 28 U.S.C. § 1391 and, as a matter related to the PMC bankruptcy, pursuant to the provisions of 28 U.S.C. § 1409.

## THE PARTIES

### Plaintiff

9.     The bankruptcy of PMC and its affiliates led the bankruptcy court to create a litigation trust and appoint a litigation trustee through the Debtors' Second Amended Joint Plan Under Chapter 11 (the "Plan") and the bankruptcy court's Order Confirming Modified Second Amended Joint Plan Under Chapter 11 of ProMedCo of Las Cruces, Inc., et al. (the "Confirmation Order").  Under the Plan and Confirmation Order, PMC and its subsidiaries and certain investors and creditors assigned to the Trustee the claims he has brought in this lawsuit (collectively the "Contributed Causes of Action").  The bankruptcy court's Confirmation Order provides the Trustee full authority to pursue these claims.  The court of appeals' decision made it clear that the state court judgment did not affect the operation of this order.  So this is not in dispute.

### Defendants

10.     Richard E. Ragsdale ("Ragsdale"), a natural person, is a citizen of Tennessee. During the relevant time, he served as a director and member of the Executive, Compensation, and Option Committees of PMC.  In November 1998, Ragsdale stepped down as Chairman of PMC's Board of Directors and became Chairman of the Executive Committee.  As of March 1, 1999, Ragsdale owned 10.3 percent of the issued and outstanding common stock of PMC.  He also received compensation from PMC for consulting services.

11.     Ragsdale may be cited to appear by serving a copy of the summons and Complaint on him at his home address at 3841 Green Hills Village Drive, Nashville, TN 37215-2691 or, if unavailable, through the Texas Secretary of State under section 17.044 of the Texas Civil Practice and Remedies Code.

12.     Arthur Andersen LLP ("Andersen") is an Illinois limited liability partnership and has its remaining office in Chicago, Illinois.  Andersen and all of its partners are citizens of Illinois.  During the relevant time, Andersen provided auditing and accounting services to PMC.

13.     Andersen may be cited to appear by serving a copy of the summons and Complaint on its registered agent CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

## FACTUAL BACKGROUND

### The Inception and Growth of PMC

14.     PMC began on July 1, 1994, when Ragsdale, H. Wayne Posey, and others caused the incorporation of ProMedCo, Inc., under the laws of Texas.  In 1996, ProMedCo, Inc., merged with PMC, a Delaware corporation.  PMC survived the merger; ProMedCo, Inc., did not.

15.     PMC's business consisted of managing physician practices in non-urban markets. PMC typically sought out and then negotiated with physician practice groups, or clinics, to buy their non-real estate assets with cash and PMC stock.  PMC formed a separate subsidiary to operate each clinic it acquired.  The subsidiary received a management fee equal to a percentage of the clinic's operating income, which consisted mainly of fees for medical services, less clinic expenses other than payments to physicians.

16.     PMC grew rapidly from 1995 through 1998, purchasing more than 20 clinics in Texas, Florida, Massachusetts, Nevada, and other states.  The net revenue that PMC reported

increased exponentially, rising from $2,259,149 in 1994, the first year of operations, to $7,843,717 in 1995, $26,245,196 in 1996, $80,641,535 in 1997, and $222,502,115 in 1998.

17.     PMC financed its growth with other people's money.  It borrowed tens of millions of dollars from private lenders.  It also raised capital from the investing public, completing an initial public offering ("IPO") of four million shares of common stock on March 12, 1997, aggregating nearly $32 million.  PMC received $72 million from a secondary offering of common stock (6.9 million shares) approximately a year later.  PMC shares traded on Nasdaq National Market under the "PMCO" symbol.

18.     The sale of PMC stock to public investors meant that PMC had to start complying with federal securities law requirements for public companies.  These included mandates for filing quarterly and annual reports with the Securities and Exchange Commission ("SEC") in Washington, D.C., and timely disclosing in those and other public filings material financial information about the company.  Relevant state law continued to apply to PMC's sales of securities and other activities.

### From Aggressive to Reckless

19.     PMC's growth strategy went from ambitious and aggressive to foolhardy and reckless in 1998 and later.  Red flags warned of the danger.  During the third quarter of 1998, for instance, the physician practice management ("PPM") sector suffered a major decline.  On July 19, 1998, a large PPM company, FPA Medical Management, Inc. ("FPA"), filed for bankruptcy protection after surprising the market with disappointing earnings reports.  FPA's stock price had fallen from $40 per share in October 1997 to less than $3 per share weeks before the bankruptcy filing.  On July 23, 1998, another big PPM company, PhyCor, Inc., disclosed that it would take a $65 million "impairment" charge and would miss its "targeted earnings per share" by 10 percent. Earlier in the year, PhyCor had called off an $8 billion merger with MedPartners, Inc., also a

PPM company, which promptly announced a fourth-quarter 1997 loss and saw its stock price plummet by 40 percent.    PhyCor's disclosure on July 23, and a follow-on disclosure in September, caused its stock price to plunge. Negative developments like these in the PPM sector forced the market price of PMC's stock down to $4.12 per share in the fourth quarter from a high of $16.25 in the first quarter—a drop of nearly 75 percent.

20.    In the meantime, PMC more and more depended on exotic revenue streams to meet Wall Street expectations and cover up its own failing business plan—"Other Revenue" in particular.  PMC's 10-K reports for 1997 and 1998 described Other Revenue as "fees from management consulting, supplemental implementation services, and other miscellaneous revenues." PMC reported $0 of Other Revenue in each of 1995 and 1996 but $6,755,000 in 1997 and $5,765,000 in 1998.  Other Revenue represented 23 percent of the net income PMC reported in 1997 and 47.3 percent in 1998.   The great majority of Other Revenue came from "implementation" fees that PMC started charging in 1997, in theory for designing and implementing business plans for individual clinics.  In reality, however, these implementation fees were nothing more than kickbacks designed to inflate PMC's revenues and net income. Specifically, when PMC would negotiate for the purchase of a physician practice group, after agreeing to the purchase price with the sellers, PMC would bump up the purchase price by the amount of an implementation fee.  When the deal closed, PMC would pay the selling physicians the total of the agreed upon purchase price, including the implementation fee.  The sellers would then turn around and pay the implementation fee back to PMC or, on rare occasions, PMC would net it against the purchase price.  PMC would then record the implementation fee as current period revenue, improperly increasing operating income for the accounting period. This resulted in inflated income (or decreased losses), assets, and stockholders' equity.  From 1997 to 2000, the aggregate amount of revenue attributed to implementation fees exceeded $25,000,000.  In

order to keep track of what was real and what was fake, PMC kept two sets of books—one used by management, and another that was shown to investors and creditors.

21.     PMC ran into trouble with the SEC over its reporting of Other Revenue.  In a comment letter of August 31, 1998, the SEC's Division of Corporation Finance directed PMC to make changes to its report on Form 10-K and other SEC filings.  Item 4 required PMC to "disclose the nature of . . . the Other Revenue."  Instead of giving more information about Other Revenue in response to the SEC's direction, PMC stopped disclosing it altogether.

22.     Ragsdale knew or recklessly failed to know of these and other problems, including:

a.  Posey's financial distress, which led him to borrow $600,000 from Ragsdale and another director, Thomas Chaney, in January 1997, $600,000 from PMC in May 1997, and $2 million from PMC in August 1998;

b.  Management's consistent emphasis in public disclosures about "same-group" or "same-market" growth and disdain for comparisons between PMC and other PPM companies;

c.  The delegation of Board of Directors powers and responsibilities to an Executive Committee that consisted of PMC insiders who by virtue of their positions and substantial holdings of PMC stock had the strongest incentive to misrepresent PMC's financial condition;

d.  The failure of the Board of Directors to request (and of management to provide) basic information necessary to evaluate PMC's acquisitions and acquisition strategy, including the "more selective strategy" management announced on November 12, 1998, and its revenue recognition practices, including the booking of implementation fees;

e.  Management's excessive emphasis on meeting Wall Street's earnings expectations and boosting PMC's stock price;

f.  PMC's announcement to the Board in May 1999 of a high-yield bond offering but its inability to consummate the offering, partly as a result of PMC management's unwillingness to disclose accurate clinic-by-clinic financial information;

g.  The inexperience of PMC's Audit Committee members, their irregular and lack of preparation for meetings, the absence of agendas for or minutes of the few and erratic meetings they did have, and their utter failure to exercise effective oversight of management or Andersen;

> h.   The growing size of Other Revenue, including implementation fees, absolutely and as a percentage of revenue and net income;
>
> i.   Management's internal reallocation of "Other Revenue" from "Corporate" to individual clinics;
>
> j.   Negative cash flow from operations in 1998 of more than $12 million; and
>
> k.   The negative tangible net worth in 1999 of more than $44 million and growing insolvency.

23.     Ragsdale at best turned a blind eye to these and other warning signs.  During a board meeting on September 11, 1998, for example, management "noted that our successful performance was continuing, and although a sector recovery may require some time, value investors were currently beginning to show interest in ProMedCo stock."  Despite the disaster befalling practically every other member of the PPM sector at the time, none of the attendees, including Ragsdale, questioned management's sunny portrayal or even sought additional information.  On the contrary, at its next meeting on November 18, 1998, the PMC board, led by Ragsdale, unanimously voted to reward Posey for "the Company's successful growth" by naming him Chairman of the Board.

### Bank Loans and Further Investments

24.     PMC's hunger for growth far outstripped its ability to pay for new acquisitions from cash flow.  On December 17, 1998, PMC entered into a revolving credit facility with a group of banks (the "PMC Bank Group").  The facility provided up to $125 million available for borrowing.  In 1999, the PMC Bank Group's commitment grew to $157.5 million, substantially all of which PMC borrowed.  PMC pledged substantially all of its assets, including those of its subsidiaries, to the PMC Bank Group as security for the loans.

25.     Under a Securities Purchase Agreement of January 13, 2000, affiliates of Goldman Sachs & Co. ("GS Affiliates") paid PMC $16 million for PMC senior subordinated notes and 1.25 million shares of PMC common stock.  This was the first step of a two-step

transaction. Step two occurred on June 12, 2000, when the GS Affiliates paid PMC another $39 million to buy Series A Convertible Preferred Stock, Series B Convertible Preferred Stock, and warrants.

26.    On July 13, 2000, MTS Investors E, L.P. ("MTS") entered into a stock purchase agreement under which it paid GS Affiliates $10 million for shares of Series A Convertible Preferred Stock and Series B Convertible Preferred Stock.

### PMC's Materially False Financial Statements

27.    Throughout the relevant time, the financial statements of PMC materially overstated its revenues, earnings, income, assets, and net worth. The material overstatements resulted, at least in part, from improper revenue recognition in connection with PMC's acquisition of physician groups/clinics and their assets, from failure to make adjustments to reflect amended terms of agreements with physician groups/clinics, and from artificial inflation of and failure to write down the value of intangible and other assets. PMC's financial statements also did not comply in material respects with generally accepted accounting principles ("GAAP").

28.    The financial statements that materially overstated PMC's revenues, earnings, income, assets, and net worth and violated GAAP included those that PMC filed with the Securities and Exchange Commission during 1998 and 1999 and specifically included PMC Annual Report on Form 10-K for the year ending December 31, 1999 ("1999 10-K").

### Andersen's Faulty Audit Work for PMC

29.    Andersen audited PMC's financial statements, including those in the 1999 10-K. In the 1999 10-K, Andersen reported that "[i]n [their] opinion, the financial statements referred to [in the 1999 10-K] present fairly, in all material respects, the financial position of [PMC] and subsidiaries as of December 31, 1999 and 1998, and the results of their operations and their cash

flows for each of the three years in the period ended December 31, 1999 . . ." PMC contracted with and paid Andersen for the auditing work it performed with respect to those financial statements.

30.     Andersen's audit work should have uncovered the material overstatements in PMC's financial statements. Andersen failed to follow generally accepted auditing standards ("GAAS") in performing the audit work for PMC but represented, in writing, that it did. Andersen also represented, in writing, that PMC's financial statements complied with GAAP when they did not.

### Material Misrepresentations and Omissions to Creditors and Investors

31.     The defendants made material misrepresentations and omissions to PMC's creditors and investors. The misrepresentations and omissions principally concerned PMC's financial condition and conveyed the impression to PMC's creditors and investors that PMC enjoyed materially better financial health than it in fact enjoyed.

32.     Ragsdale falsely represented to the PMC Bank Group, the GS Affiliates, and MTS in PMC's 1998 and 1999 10-Ks that PMC had net income of $12,202,000 in 1998 and $16,011,000 in 1999, stockholders equity of $172,648,000 in 1998 and $182,631,000 in 1999, diluted earnings per share of $.58 in 1998 and $.71 in 1999, 14 percent same market growth in revenue for communities in which PMC operated longer than one year in 1999 (1999 10-K only), and "Other Revenue" of $5,765,000 in 1998 and $6,755,000 in 1997 (1998 10-K only).

33.     Ragsdale represented in PMC's 1999 10-K that the market price of PMC common stock would have to recover to reflect its value, falsely implying that market price of the stock was undervalued.

34.     Ragsdale misleadingly stated in the 1998 10-K that "[o]ther revenue represents fees from management consulting, supplemental implementation services, and other



miscellaneous revenues" without disclosing PMC's bogus revenue recognition policy or that PMC had improperly booked those "fees" as revenue.

35.    Ragsdale falsely stated in the 1999 10-K that "[t]otal revenue also includes amounts earned for other services rendered, including contract billing, medical directorships, interim management, strategic and financial planning and management consulting" without disclosing PMC's bogus revenue recognition policy or that PMC had not "earned" those "amounts" and had improperly booked them as revenue.

36.    Ragsdale made the false representations alleged in paragraphs 32 through 35 above by signing the 1998 and 1999 10-Ks with the intent and knowledge that the 10-Ks would be filed with the SEC and provided to and relied on by the PMC Bank Group (1998 and 1999 10-Ks) and the GS Affiliates and MTS (1999 10-K only).  The PMC Bank Group, the GS Affiliates, and MTS received the 1999 10-K in late March or early April 2000.

37.    Under Ragsdale's watchful eye, Posey directed PMC's general counsel and vice president of administration, Deborah A. Johnson, to represent to the GS Affiliates and MTS in an Officer's Certificate of January 13, 2000, that the representations and warranties of PMC in the Securities Purchase Agreement between PMC and GS Capital Partners, III, L.P., were true and correct as of that date and that she had the knowledge necessary to enable her to make the certification.  Posey directed Johnson to sign the Officer's Certificate without having read the Securities Purchase Agreement and without adequate knowledge of whether the representations were true and correct.  Ragsdale allowed Posey to do this with the intent and knowledge that the certification would be provided to and relied on by the GS Affiliates and MTS.

38.    Ragsdale allowed Posey falsely to represent to the PMC Bank Group in a February 2000 Offering Memorandum for a $225 million senior credit facility the "growth" in earnings before interest, taxes, depreciation, and amortization ("EBITDA") of clinics PMC had

acquired. Ragsdale then allowed Posey to approve the Offering Memorandum with the intent and knowledge that it would be provided to and relied on by the PMC Bank Group. The PMC Bank Group received the Offering Memorandum in February 2000.

39. Ragsdale allowed Posey falsely to represent to the PMC Bank Group in an October 1998 Confidential Offering Memorandum for a $125 million senior revolving credit facility that PMC had EBITDA of $20,324,100 in the first six months of 1998 and that PMC's "'same store' growth has consistently exceeded 15% since the Company's March 1997 IPO." Ragsdale allowed Posey to approve the Confidential Offering Memorandum with the intent and knowledge that it would be provided to and relied on by the PMC Bank Group.

40. Ragsdale falsely represented to the PMC Bank Group in a December 17, 1998 press release that PMC was "a strong, disciplined company generating selective, value-added affiliations, strong internal growth and sound physician relationships." Ragsdale approved the press release with the intent and knowledge that it would be provided to and relied on by the PMC Bank Group.

41. Ragsdale allowed Posey falsely to represent to the GS Affiliates and MTS that PMC clinics earned revenues that were in fact attributable to implementation fees unrelated to those clinics. Posey made the false representations by providing to the GS Affiliates and MTS spreadsheets that inflated the revenues properly attributable to individual clinics' operations and by orally vouching for the accuracy of the spreadsheets. PMC, with the knowledge and approval of management provided the spreadsheets to the GS Affiliates and MTS in October, November, and December 1999 and in January, February, March, April, May, and June 2000. Management orally vouched for the spreadsheets' accuracy in discussions with Sanjeev Mehra and Curtis Lane, among others, during those time periods.

42.     On Ragsdale's watch, Robert Smith, PMC's Chief Financial Officer falsely represented in bank credit agreements and in Compliance Certificates to the PMC Bank Group from the second half of 1998 through 2000 that PMC was solvent, that it was in compliance with the covenants in the credit agreements, and that its financial statements had been prepared in accordance with GAAP.  With Ragsdale's awareness, knowledge, or indifference Smith made the false representations in the credit agreement of December 17, 1998; Compliance Certificates dated May 20, 1999, November 19, 1999, April 4, 2000, May 22, 2000, June 30, 2000, July 31, 2000, August 22, 2000, and August 30, 2000; and the amended credit agreements of December 31, 1998, June 29, 1999, August 2, 1999, November 9, 1999, November 12, 1999, March 25, 2000, and June 12, 2000.

43.     Under Ragsdale's oversight, Posey consistently overstated and therefore falsely represented PMC's EBITDA, revenues, "same store" growth rates, assets, and net income in 10-Q reports and press releases from the second half of 1998 through 2000.  Posey made the false representations by signing and authorizing the issuance of PMC's 10-Q reports for the third quarter of 1998, the first through third quarters of 1999, and the first and second quarters of 2000 and in PMC press releases dated May 14, 1998, August 5, 1998, August 12, 1998, November 12, 1998, December 17, 1998, March 4, 1999, May 13, 1999, August 2, 1999, August 10, 1999, November 11, 1999, January 13, 2000, March 2, 2000, May 8, 2000, May 15, 2000, May 22, 2000, May 31, 2000, June 13, 2000, and August 14, 2000.  At the time management made the false representations, it intended and knew that the 10-Q reports and press releases would be filed with the SEC and provided to the PMC Bank Group and (with respect to the 10-Q reports and press releases dated in September 1999 through July 13, 2000) to the GS Affiliates and MTS.

44.     Andersen falsely represented to PMC, the PMC Bank Group, the GS Affiliates, and MTS that it conducted its audits in accordance with GAAS and that in its opinion the PMC financial statements presented fairly, in all material respects, the financial position of PMC and subsidiaries as of December 31, 1998 and 1999, in conformity with GAAP.  Andersen made the false representations in PMC's 1998 and 1999 10-Ks by signing a clean audit opinion with the intent and knowledge that the opinion would be provided to and relied on by PMC, the PMC Bank Group, the GS Affiliates, and MTS.

45.     Ragsdale had a duty to disclose but failed to disclose to the GS Affiliates and MTS that the relationship between PMC and the PMC Bank Group had been irreparably damaged when on May 12, 2000 Smith requested a bridge loan from Bank of America representative Larry Gordon and that PMC was in a liquidity crisis during the four weeks before the closing of the second step of the GS Affiliates' purchase of preferred stock from PMC on or about June 13, 2000.  Ragsdale had a duty to disclose the irreparable damage to the banking relationship and the liquidity crisis because he knew those facts in May 2000 and that they were necessary to prevent his partial and ambiguous statements of the facts from being misleading to the GS Affiliates and MTS.

46.     Ragsdale did not rely in good faith on Andersen's audit opinions.  Any claims that he did are not credible in light of what he knew at the time Andersen issued its reports—specifically, (1) Andersen warned Ragsdale and the other officers and directors that PMC's accounting policies were very aggressive; (2) PMC's viability as a going concern was questionable; (3) PMC's internal controls were ineffective; (4) there was significant risk of accounting malfeasance at PMC and; (5) PMC's board and audit committee abdicated any responsibility to oversee the company's accounting practices and Andersen's audits (which

resulted in non-compliance with GAAS and GAAP and did not protect PMC, its creditors and stockholders against the company's eventual insolvency).

47.    PMC and the PMC creditors and investors, including the PMC Bank Group, the GS Affiliates, and MTS, relied on the false representations and omissions by, among other things, lending money, forbearing from actions to protect their interests, and purchasing securities. PMC relied by continuing to make acquisitions and operate its clinics after it became insolvent and its business model proved hopelessly flawed. The PMC Bank Group's reliance consisted of entering into the credit agreement of December 17, 1998; approving waivers of PMC's non-compliance with covenants in the credit agreement; amending the credit agreement; and allowing PMC to borrow funds under the credit agreement. The reliance of the GS Affiliates involved paying PMC $16 million on January 13, 2000, for PMC senior subordinated notes and 1.25 million shares of PMC common stock and an additional $39 million on June 13, 2000, for shares of Series A Convertible Preferred Stock and Series B Preferred Stock in PMC and warrants to buy PMC common stock. MTS relied on the false representations and omissions by paying the GS Affiliates $10 million on July 13, 2000, for shares of Series A Convertible Preferred Stock and Series B Preferred Stock in PMC.

**Mismanagement by PMC's Executives and Directors**

48.    Ragsdale breached his obligations as a fiduciary to PMC and its creditors by failing to manage it with due care and without regard to self-interests. Ragsdale's conduct in derogation of his fiduciary duties of care and loyalty was grossly negligent and consisted of the following conduct:

a.    suppression or omission of the fact that PMC's business model was failing and had no reasonable prospect of becoming successful;

b.    pursuit and consummation of acquisitions that he did not sufficiently inform himself about in good faith and that he did not honestly believe would serve the best interests of PMC;

 c.  permitting Posey to withhold material information about such acquisitions;

 d.  permitting PMC to book revenues it did not earn in the current period;

 e.  allowance of PMC executives to take personal benefits from transactions, opportunities, and information that either involved PMC or belonged to PMC, including the making and attempted forgiveness of a $2 million loan to Posey, and special bonuses paid to senior management in June 2000;

 f.  failure to hold meetings of board committees, including the audit and executive committees, at the times and with the frequency necessary to exercise effective oversight;

 g.  failure to prepare for, participate in, and take or require minutes of board and board committee meetings;

 h.  failure to require compliance with board and committee members' fundamental duties under the PMC by-laws and otherwise;

 i.  failure to take steps necessary to assure adequate financial and accounting controls; permitting arbitrary or otherwise inappropriate accounting entries and adjustments in PMC's books and records; and

 j.  authorization of the use, filing, and publication of materially misleading financial statements.

These breaches of fiduciary duty caused enormous damage to PMC and its creditors—by, among other things, deepening its insolvency through the incurrence of debt, creating operational limitations that hurt PMC's ability to run its business in a profitable manner, undermining PMC's relationships with its customers, suppliers, and employees, destroying its credibility with investors and creditors, and ultimately driving it into bankruptcy. These breaches of fiduciary duty also caused damage to PMC and its creditors by fostering the sale of equity securities. Although billed as a lifeline for PMC, the sale of equity did nothing to alleviate the deepening insolvency of the company.

### Andersen's Knowing Participation in Mismanagement

 49. Andersen audited PMC's financial statements annually and reviewed its quarterly reports. It also periodically met with management and PMC's Audit Committee and provided and agreed to provide additional services to PMC. Through this work, Andersen grew familiar

with PMC's executive management, its business model and operations, and the role of the officers and directors, including Ragsdale, in the management of PMC. Andersen knew that the officers and directors were officers and directors and that it owed a fiduciary duty to PMC and, once it entered the zone of insolvency, to its creditors. Andersen also knew that PMC intended to continue pursuing an aggressive acquisition strategy and to procure the means for doing so by inducing its banks to lend additional money and the GS Affiliates and MTS to make investments. Andersen additionally knew that PMC had a dependent and passive board and audit committee and that neither the board nor the audit committee exercised effective oversight of PMC's management, its accounting practices, or Andersen's audits. Andersen knew as well that PMC's accounting policies were very aggressive, that its ability to continue as a going concern was questionable due to substantial operating losses and negative net worth, that there was substantial risk of financial malfeasance and breach of fiduciary duty by PMC's officers and directors, that PMC's management was under tremendous pressure to meet analyst expectations and sustain its stock price, that PMC was highly leveraged, and that in all but one of fifteen categories PMC's "specific controls" were ineffective and could not be relied upon. These and other red flags that Andersen observed during its audits and quarterly reviews for PMC indicated that PMC management was at least in breach of its fiduciary duties and/or deceptive. Andersen did nothing to correct or even report the breaches of fiduciary duties by Ragsdale or the other officers and directors to appropriate persons, including PMC shareholders, the audit committee, and the board of directors. Instead, Andersen knowingly assisted in Ragsdale's breach of fiduciary duties by issuing clean audit opinions and favorable quarterly reports, which in turn enabled PMC to continue acquisitions and operations.

## CLAIMS

### COUNT I
### (Request for Declaratory Judgment)

50.     The Trustee repeats and incorporates by reference each of the preceding allegations.

51.     Because a substantial and ongoing dispute exists between the parties, the Trustee requests declaratory and incidental relief under 28 U.S.C. § 2201.  Specifically, the Trustee seeks a declaration that the state court dismissed claims against defendants for lack of jurisdiction and that applicable law tolled limitations during the pendency of the state court case and for sixty (60) days after the dismissal order became final following affirmance by the court of appeals.  A justicable controversy exists here.

## COUNT II
### (Negligence)

52.     The Trustee repeats and incorporates by reference each of the preceding allegations.

53.     Andersen negligently performed auditing services with respect to PMC's financial statements by, among other things, failing to uncover or report material misstatements and omissions and GAAP violations and failing to conduct the auditing work in accordance with GAAS.  Andersen's negligence proximately caused damage to PMC and/or the Trustee as owner and assignee of claims under the Confirmation Order.

## COUNT III
### (Negligent Misrepresentation)

54.     The Trustee repeats and incorporates by reference each of the preceding allegations.

55.     Both defendants supplied the false information as alleged in paragraphs 31 through 48 above to PMC, the PMC Bank Group, GS Affiliates, and MTS for their guidance in the course of the defendants' business, which in the case of Ragsdale consisted of his service as an officer and director of PMC and in the case of Andersen consisted of providing audit,

accounting, and related services. The defendants also supplied the false information to PMC, the PMC Bank Group, the GS Affiliates, and MTS for their guidance in transactions in which the defendants had a pecuniary interest by virtue of the fact that they stood to profit directly and indirectly from the transactions. As alleged in paragraph 10, Ragsdale owned PMC stock, options, and/or warrants to acquire PMC stock. Ragsdale also directly received income from the salaries, bonuses, and consulting fees PMC paid him. The pecuniary interest of Andersen was the fees it received for its auditing services. The defendants failed to exercise reasonable care in providing the false information. PMC, the PMC Bank Group, GS Affiliates, and MTS justifiably relied on the false information and suffered damage as a result of such justifiable reliance as alleged in paragraph 47 above.

## COUNT IV
### (Breach and Participation in Breach of Fiduciary Duties)

56.     The Trustee repeats and incorporates by reference each of the preceding allegations.

57.     Ragsdale breached his fiduciary duties of care and loyalty to PMC and its creditors as alleged in paragraphs 19 through 23 and 48 above. These breaches proximately caused damage to PMC and its creditors and/or the Trustee as owner and assignee of claims under the Confirmation Order.

58.     Andersen knowingly participated in these breaches of fiduciary duties and made itself a joint tortfeasor with Ragsdale.

## COUNT V
### (Violation of Texas Securities Act)

59.     The Trustee repeats and incorporates by reference each of the preceding allegations.

60.     PMC sold securities to the GS Affiliates and MTS in the form of senior subordinated notes, Series A Convertible Preferred Stock, Series B Convertible Preferred Stock, and warrants. PMC did so by means of an untrue statement of material fact or an omission to state a fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. PMC's conduct violated article 581-33.A.(2) of the Texas Securities Act.

61.     Ragsdale directly or indirectly controlled PMC at the time it sold the securities to GS Affiliates and MTS. Ragsdale exercised control over PMC as the Chairman of its Executive Committee, a substantial shareholder, a consultant, and a key lender to Posey. Ragsdale exercised control over PMC by virtue of his positions as an officer and director of PMC and ownership of PMC stock. He had the power to control the specific activity or transaction upon which the primary violation is predicated and therefore is jointly and severally liable to the same extent as if he were the seller of the securities. The Trustee, as owner and assignee of claims under the Confirmation Order, seeks rescission (including recovery of the consideration paid for the securities plus interest thereon at the legal rate from the date of payment less the amount of any income received on the securities) or damages from Ragsdale under the Texas Securities Act. These securities have been and to the extent necessary are hereby again tendered.

62.     Ragsdale directly or indirectly with intent to deceive or with reckless disregard for the truth or the law materially aided PMC and is liable jointly and severally to the same extent as if he were the seller or issuer of the securities under article 581-33.F.(2) of the Texas Securities Act.

## COUNT VI
### (Exemplary Damages)

63.     The Trustee repeats and incorporates by reference each of the preceding allegations.

64.     The harm with respect to which the Trustee seeks recovery of exemplary damages resulted from the malice of Ragsdale and Andersen.   The Trustee may therefore recover exemplary damages from them for the conduct alleged in Count III under chapter 41 of the Texas Civil Practice and Remedies Code.

## PRAYER

65.     The Trustee prays that the Court summon the defendants to appear and defend; grant the Trustee declaratory and incidental relief regarding the state court's dismissal; and, subject to the Court's granting the declaratory relief, award the Trustee actual and exemplary damages, rescission or rescissory damages, reasonable attorney's fees, pre-judgment and post-judgment interest, costs of court, and all other relief that law or equity justly entitles the Trustee to receive.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

Michael P. Fritz   w/ permission by Jane Felton
Star Bar No.
24040936

Barry C. Barnett
State Bar No. 01778700
Michael P. Fritz
State Bar No. 24036599
901 Main Street, Suite 5100
Dallas, Texas 75202-3775
Telephone: 214-754-1900
Facsimile: 214-754-1933

**ATTORNEYS FOR THE LITIGATION
TRUSTEE**

JS 44 (Rev. 10/06)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Steven S. Turoff, as a Litigation Trustee, of the Promedco Recovery Trust

**DEFENDANTS**

, Richard D. Ragsdale, and Arthur Andersen, LLP

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

*RECEIVED*
*JUL - 3 2007*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF TEXAS*

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Barry C. Barnett and Michael P. Fritz; Susman Godfrey, Dallas, Texas 75202
214-754-1900

Attorneys (If Known)

# 307 - CV1198-P

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | **PERSONAL PROPERTY** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 370 Other Fraud | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | ☐ 371 Truth in Lending | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | ☐ 380 Other Personal Property Damage | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 385 Property Damage Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | |
| ☐ 240 Torts to Land | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 443 Housing/ Accommodations | ☐ 530 General | | |
| | ☐ 444 Welfare | ☐ 535 Death Penalty | | |
| | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332; 28 U.S.C. 1334(b)
Brief description of cause: Case is against Former Officers and Directors of PMC and it auditors for negligence; negligent misrepresentation; Declatory judgment; Breach of Fiduciary Duty, Violations of Tx. Sec. Act ;

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Greater than $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED

(See instructions): JUDGE _____    DOCKET NUMBER _____

DATE 07/03/07

SIGNATURE OF ATTORNEY OF RECORD
*Michael P. Fritz*

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____